# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 7, 2013                    Decided July 26, 2013

No. 10-1425

STATE OF TEXAS, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

CONSERVATION LAW FOUNDATION, ET AL.,
INTERVENORS

———

Consolidated with Nos. 11-1062, 11-1128, 11-1247,
11-1249, 11-1250

———

On Petitions for Review of Final Actions of
the United States Environmental Protection Agency

———

*Mark W. DeLaquil* argued the cause for petitioners. With him on the briefs were *David B. Rivkin Jr.*, *Andrew M. Grossman*, *Matthew G. Paulson*, *Roger R. Martella Jr.*, *F. William Brownell*, *Henry V. Nickel*, *Norman W. Fichthorn*, *Allison D. Wood*, *Charles H. Knauss*, *Shannon S. Broome*, *Greg Abbott*, Attorney General, Office of the Attorney General for the State of Texas, *J. Reed Clay Jr.*, Special Assistant and Senior Counsel to the Attorney General, *John A. Riley*, and

*Christopher C. Thiele*. *Bill Cobb*, Deputy Attorney General for Civil Litigation, Office of the Attorney General for the State of Texas, entered an appearance.

*Madeline P. Fleisher*, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief were *Howard J. Hoffman*, *Elliott Zenick*, and *Sara Schneeberg*, Attorneys, U.S. Environmental Protection Agency. *Thomas A. Lorenzen* and *Perry M. Rosen*, Attorneys, U.S. Department of Justice, entered appearances.

*Sean H. Donahue* argued the cause for intervenors. With him on the brief were *Joanne M. Spalding*, *Nathan Matthews*, *Vickie L. Patton*, *Pamela Campos*, *Peter Zalzal*, *Ann Brewster Weeks*, *Lisa J. Zak*, and *David Doniger*. *Meleah A. Geertsma* and *Craig H. Segall* entered appearances.

———

No. 11-1037

UTILITY AIR REGULATORY GROUP,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

WYOMING MINING ASSOCIATION AND STATE OF
CONNECTICUT,
INTERVENORS

———

4

Consolidated with Nos. 11-1038, 11-1039, 11-1040,
11-1041, 11-1059, 11-1060, 11-1063, 11-1075,
11-1076, 11-1077, 11-1078, 11-1287, 11-1288,
11-1289, 11-1290, 11-1291, 11-1292, 11-1293

————

On Petitions for Review of Final Actions of
the United States Environmental Protection Agency

————

*David B. Rivkin Jr.* argued the cause for petitioner State of Texas. *Nancy E. Vehr*, Attorney, Office of the Attorney General for the State of Wyoming, argued the cause for the State of Wyoming. With them on the briefs were *Greg Abbott*, Attorney General, Office of the Attorney General for the State of Texas, *J. Reed Clay Jr.*, Special Assistant and Senior Counsel to the Attorney General, *Jay Jerde*, Deputy Attorney General, Office of the Attorney General for the State of Wyoming, *Jeremiah I. Williamson*, Assistant Attorney General, and *Mark W. DeLaquil* and *Andrew M. Grossman.*

*Henry V. Nickel* argued the cause for Non-State Petitioners and Intervenor-Petitioner. With him on the briefs were *F. William Brownell*, *Norman W. Fichthorn*, *Allison D. Wood*, *Peter S. Glaser*, *Charles H. Knauss*, *Shannon S. Broome*, *Matthew G. Paulson*, *Roger R. Martella*, and *Eric Groten. Mark E. Nagle* entered an appearance.

*Madeline P. Fleisher* and *Matthew R. Oakes*, Attorneys, U.S. Department of Justice, argued the causes for respondents. With them on the brief were *Howard J. Hoffman*, Attorney, United States Environmental Protection Agency, *Elliott Zenick*, Assistant General Counsel, and *Sara Schneeberg*, Attorney. *Perry M. Rosen*, Attorney, U.S. Department of Justice, entered an appearance.

*George Jepsen*, Attorney General, Office of the Attorney General for the State of Connecticut, *Kimberly P. Massicotte* and *Scott N. Koschwitz*, Assistant Attorneys General, *Vickie L. Patton*, *Pamela Campos*, *Peter M. Zalzal*, *Sean H. Donahue*, *Joanne M. Spalding*, *Nathan Matthews*, *David D. Doniger*, *Meleah A. Geertsma*, *Ann Brewster Weeks*, and *Lisa J. Zak* were on the briefs for intervenors in support of respondent.

Before: ROGERS, TATEL and KAVANAUGH, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

Dissenting opinion by *Circuit Judge* KAVANAUGH.

ROGERS, *Circuit Judge*: These cases present another set of challenges to rules promulgated by the Environmental Protection Agency ("EPA") in response to the Supreme Court's holding that greenhouse gases unambiguously qualify as an "air pollutant" under the Clean Air Act ("the Act" or "CAA"). *See Massachusetts v. EPA*, 549 U.S. 497, 528–32 (2007). Last year, in *Coalition for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102 (D.C. Cir. 2012) ("*Coalition*"), this court upheld EPA's regulation in the *Tailpipe Rule* of greenhouse gases emitted by cars and light trucks under Title II of the CAA, *id.* at 116–29, as well as its determination that the rule triggered permitting requirements for new major stationary sources of greenhouse gases under Part C of Title I of the CAA, *id.* at 132–44. The court dismissed for lack of standing under Article III of the U.S. Constitution challenges by States and industry groups to *Timing* and *Tailoring Rules* that ameliorated the burden of Part C permitting for greenhouse gases. *Id.* at 144–48.

At issue here is implementation of the Part C permitting requirements in several States without implementation plans for greenhouse gases as of January 2, 2011, when the emission

standards in the *Tailpipe Rule* took effect. The States of Texas and Wyoming and industry groups petition for review of five rules designed to ensure that a permitting authority existed to issue the required greenhouse gas permits. Petitioners contend the rules are based on an impermissible interpretation of the Part C Prevention of Significant Deterioration program, CAA §§ 160–169, and violate the Act's "orderly process" for revision of state implementation plans ("SIPs") pursuant to CAA § 110. The court on more than one occasion has interpreted CAA § 165(a) unambiguously to prohibit construction or modification of a major emitting facility without a Part C permit that meets the statutory requirements with regard to each pollutant subject to regulation under the Act. Because we now hold that under the plain text of CAA § 165(a) and § 167 the permitting requirements are self-executing without regard to previously approved SIPs, industry petitioners fail to show how they have been injured in fact by rules enabling issuance of the necessary permits. State petitioners likewise fail, in the face of Congress's mandate in CAA § 165(a), to show how vacating the rules would redress their purported injuries. Accordingly, because petitioners lack Article III standing to challenge the rules, we dismiss the petitions for lack of jurisdiction.

We begin in Part I with a brief overview of relevant provisions of the Act and the regulatory and procedural background of the challenged rules. In Part II, we address CAA § 165(a), which underlies the rules, and petitioners' interpretation of the Part C permitting requirements. In Part III, we turn to the challenged rules and must initially address whether petitioners have Article III standing to challenge them.

## I.

Title I, Part A, of the Act addresses air quality and emissions limitations. It requires EPA to establish National

Ambient Air Quality Standards ("NAAQS") that set the maximum permissible levels of pollutants for which air quality criteria have been issued. CAA § 109, 42 U.S.C. § 7409. States, in turn, are required to develop SIPs to determine, based on local conditions and needs, how to implement the NAAQS and related requirements. CAA § 110, 42 U.S.C. § 7410. Section 110 provides the framework for SIP development and submission by States to EPA,"within 3 years (or such shorter period as [EPA] may prescribe)" of promulgation of a NAAQS. CAA § 110(a)(1), 42 U.S.C. § 7410(a)(1). Among other things, it requires that a SIP "includ[e] a permit program as required in parts C and D of this subchapter" and "meet the applicable requirements of . . . Part C." CAA § 110(a)(2)(C), (J), 42 U.S.C. § 7410(a)(2)(C), (J). EPA must approve a SIP "if it meets all of the applicable requirements of this chapter [i.e., Chapter 85 Air Pollution Prevention and Control]." CAA § 110(k)(3), 42 U.S.C. § 7410(k)(3). But if EPA determines that a previously approved SIP is "substantially inadequate to attain or maintain the [NAAQS] . . . or to otherwise comply with any requirement of this chapter, [EPA] shall require the State to revise the plan as necessary to correct such inadequacies." CAA § 110(k)(5), 42 U.S.C. § 7410(k)(5). Likewise, if EPA determines its approval or disapproval of a SIP "was in error, [it] may in the same manner as the approval [or] disapproval . . . revise such action as appropriate without requiring any further submission from the State." CAA § 110(k)(6), 42 U.S.C. § 7410(k)(6). When EPA disapproves a SIP "in whole or in part" or "finds that a State has failed to make a required submission," EPA must promulgate a federal implementation plan ("FIP") within two years. CAA § 110(c)(1), 42 U.S.C. § 7410(c)(1).

Parts C and D of Title I address preconstruction review requirements for new major stationary sources of air pollution. Part C, Prevention of Significant Deterioration of Air Quality ("PSD"), applies to areas that have attained the air quality

standards for any criteria pollutant. CAA §§ 160–169, 42 U.S.C. §§ 7470–79. It bars construction of a "major emitting facility" without a permit that includes emission limitations and requires the proposed facility to use "the best available control technology for each pollutant subject to regulation under this chapter emitted from, or which results from, such facility." CAA § 165(a)(4), 42 U.S.C. § 7475(a)(4). Part C also provides that EPA "shall . . . take such measures . . . as necessary to prevent the construction or modification of a major emitting facility which does not conform to the requirements of this part . . . ." CAA § 167, 42 U.S.C. § 7477. A "major emitting facility" is a stationary source that emits, or has the potential to emit, either 100 tons or 250 tons per year of "any air pollutant." CAA § 169(1), 42 U.S.C. § 7479(1). Part D, Plan Requirements for Nonattainment Areas, applies to areas that exceed the air quality standards for a NAAQS pollutant, CAA §§ 171–193, 42 U.S.C. §§ 7501–15, and requires States to develop and submit plans for attaining NAAQS, CAA § 172, 42 U.S.C. § 7502, including a permitting program for new or modified major stationary sources, CAA §§ 172(c)(5), 173, 42 U.S.C. §§ 7502(c)(5), 7503.

In response to *Massachusetts v. EPA*, 549 U.S. at 528–32, EPA determined that greenhouse gas emissions from motor vehicles may reasonably be anticipated to endanger public health and welfare by contributing to climate change, 74 Fed. Reg. 66,496 (Dec. 15, 2009) ("*Endangerment Finding*"). It then promulgated greenhouse gas emission standards for cars and light trucks pursuant to Title II of the Act, 75 Fed. Reg. 25,324 (May 7, 2010) ("*Tailpipe Rule*"). EPA announced that, under its longstanding interpretation of the Act, the *Tailpipe Rule* automatically triggered regulation of stationary sources of greenhouse gases under both the Part C preconstruction permit and the Title V operating permit requirements because, once the rule's emission standards took effect on January 2, 2011,

greenhouse gases became a regulated pollutant under the Act requiring this permitting. 75 Fed. Reg. 17,004, 17,019 (Apr. 2, 2010) ("*Timing Rule*"). EPA adopted a phased-in approach upon concluding that immediate implementation of Part C permitting for all "major emitting facilit[ies]" of greenhouse gases, CAA §§ 169(1), 302(j), 42 U.S.C. §§ 7479(1), 7602(j), would impose tremendous costs on industry and State permitting authorities; only stationary sources emitting over 75,000 or 100,000 tons of greenhouse gases annually would initially be subject to PSD and Title V requirements. 75 Fed. Reg. 31,514, 31,523 (June 3, 2010) ("*Tailoring Rule*").

On June 26, 2012, this court rejected challenges by States and industry either on the merits or for lack of standing under Article III. *Coalition*, 684 F.3d at 113. The court upheld the *Endangerment Finding* and the *Tailpipe Rule* as consistent with the Act and neither arbitrary nor capricious. *Id.* at 116–29. It also affirmed EPA's interpretation that the *Tailpipe Rule* triggered PSD and Title V permitting requirements for greenhouse gases emitted by major stationary sources. *Id.* at 129–44. The court agreed with EPA that "once the Tailpipe Rule took effect and made greenhouse gases a regulated pollutant under Title II of the Act, the PSD program automatically applied to facilities emitting [specified amounts] of greenhouse gases." *Id.* at 133. The court further noted petitioners had forfeited any challenge to EPA's greenhouse gas-inclusive interpretation of Title V. *Id.* at 136. Because PSD and Title V permitting requirements applied by automatic operation of the Act, the court held that State and industry petitioners lacked standing under Article III to challenge the *Timing* and *Tailoring Rules*, which mitigated, rather than caused, their asserted injuries. *Id.* at 146–48.

Meanwhile, in April 2010, EPA had forewarned in the *Timing Rule* that if a State with a previously approved SIP was

unable to apply greenhouse gas PSD permitting requirements by the effective date January 2, 2011, EPA would "exercise its oversight authority as appropriate to call for revisions to SIPs and to otherwise ensure sources do not commence construction without permits that satisfy the minimum requirements of the Federal PSD program." *Timing Rule*, 75 Fed. Reg. at 17,022. In June 2010, EPA requested States to submit letters explaining whether their PSD programs would apply the new greenhouse gas restrictions. *Tailoring Rule*, 75 Fed. Reg. at 31,525–26, 31,582–83. EPA stated its intention to issue a SIP Call pursuant to CAA § 110(k)(5) to any State that lacked the ability to issue PSD permits for greenhouse gas emissions and, as appropriate, to move quickly in imposing a corresponding FIP. *Id.* at 31,526, 31,583. EPA also stated that, pursuant to CAA § 110(k)(6), it might revise its prior approval of a SIP for any State that is "unable or unwilling to adopt the [greenhouse gas permitting requirements] by January 2, 2011." *Id.* at 31,582.

On September 2, 2010, EPA gave notice that it was proposing to find that EPA-approved PSD programs of thirteen States were "substantially inadequate" because their SIPs did not appear to apply PSD permitting requirements to greenhouse gas pollutants, and to require that these States revise their SIPs accordingly. 75 Fed. Reg. 53,892, 53,900 (Sept. 2, 2010) ("*Proposed SIP Call Rule*"). EPA solicited comments on whether approved PSD programs in other States applied to greenhouse gas emitting sources and, if not, proposed to require that those States also revise their SIPs. *Id.* at 53,892–93. EPA expected to finalize the rule around December 1, 2010. *Id.* at 53,901. Pursuant to CAA § 110(k)(5), EPA proposed that corrective SIP revisions be submitted within 12 months of the final rule. *Id.* Because sources would be subject to PSD permitting for greenhouse gas emissions on January 2, 2011, States could choose an earlier deadline of as little as three weeks in order to minimize the period when sources would not have a

permitting authority available to act on their permit applications. *Id.* at 53,896, 53,901–02. If a State failed to submit the required revision by its chosen date, EPA, pursuant to CAA § 110(c), would "immediately" issue a finding of failure to submit and a FIP allowing EPA to act as a supplemental permitting authority for that State and thereby prevent any gap in PSD permitting. *Id.* at 53,904. EPA separately issued notice of the proposed FIP. 75 Fed. Reg. 53,883 (Sept. 2, 2012) ("*Proposed FIP Rule*").

On December 13, 2010, EPA found that thirteen States (including Texas and Wyoming) did not apply their existing PSD programs to greenhouse gases and thus had "substantially inadequate" SIPs requiring revision. *See* 75 Fed. Reg. 77,698, 77,705 (Dec. 13, 2010) ("*SIP Call Rule*"). Five of the thirteen States chose SIP revision deadlines of between January – July 2011, anticipating completion of SIP revisions within a few months and no need for permits by stationary sources before then. *Id*. at 77,711–13. Seven States (including Wyoming) accepted the early SIP revision deadline of December 22, 2010. *Id.* at 77,710–13. On December 29, 2010, EPA found the seven States had failed to meet that deadline, 75 Fed. Reg. 81,874 (Dec. 29, 2010) ("*Failure Finding Rule*"), and issued a corresponding FIP, 75 Fed. Reg. 82,246 (Dec. 30, 2010) ("*FIP Rule*"). Under the FIP, EPA was authorized to issue only the greenhouse gas portion of the PSD permit and specified the FIP would remain in place "only as long as is necessary for the state to submit and for EPA to approve a SIP revision that includes PSD permitting for [greenhouse gas]-emitting sources." *Id.* at 82,251. States otherwise retained PSD permitting authority. EPA also offered to delegate its greenhouse gas permitting responsibility to the States. *See id.*

Of the thirteen States subject to the *SIP Call Rule*, Texas alone did not identify a preferred SIP revision deadline. *See* 75 Fed. Reg. at 77,711. In August 2010, Texas had set forth its

legal objections to EPA's greenhouse gas regulations and informed EPA that Texas had "neither the authority nor the intention of interpreting, ignoring, or amending its laws in order to compel the permitting of greenhouse gas emissions." Letter from Bryan Shaw, Chairman, Tex. Comm'n on Envtl. Quality, and Greg Abbott, Tex. Atty. Gen., to Lisa Jackson, Admin., EPA (Aug. 2, 2010) ("Texas August 2010 Letter"). EPA assigned Texas a default twelve-month SIP revision deadline of December 1, 2011 under the *SIP Call Rule*, 75 Fed. Reg. at 77,711. EPA advised it was "planning additional actions to ensure that [greenhouse gas] sources in Texas, as in every other state in the country, have available a permitting authority to process their permit applications as of January 2, 2011 (or, at the state's election, a short period thereafter that the state has said will not impede the ability of sources to obtain permits in a timely way)." *Id.*

Following up, on December 30, 2010, EPA determined, pursuant to CAA § 110(k)(6), that its prior approval of Texas's PSD program "was in error" because the SIP failed to address all pollutants that would become subject to regulation in the future or provide assurances of Texas's legal authority to do so. 75 Fed. Reg. 82,430, 82,431–33 (Dec. 30, 2010) ("*Interim Error Correction Rule*"). EPA revised its approval to be a partial disapproval, *id.* at 82,452–53, and simultaneously issued a supplementary FIP, like those for the seven other States pursuant to the *FIP Rule*, allowing EPA to issue greenhouse gas PSD permits for stationary sources in Texas, *id.* at 82,456–58. EPA issued the interim rule without public notice and comment, invoking the "good cause" exception of 5 U.S.C. § 553(b)(B), *id.* at 82,458, while simultaneously initiating notice and comment procedures on a proposed final version of the rule, *id.* at 82,434. On May 3, 2011, EPA issued the final rule, which tracked the interim rule. 76 Fed. Reg. 25,178 (May 3, 2011) ("*Error Correction Rule*").

**II.**

Petitioners now challenge five rules: the *SIP Call Rule*, *Failure Finding Rule*, *FIP Rule*, and the *Interim* and *Error Correction Rules*. Consistent with the court's holding that the PSD permitting requirements apply to greenhouse gases emitted by major stationary sources, *see Coalition*, 684 F.3d at 132–44, petitioners do not dispute that States had to update their SIPs to incorporate greenhouse gases into their PSD programs. Instead, they challenge the method and timing by which EPA required SIP revisions, and contend that States could issue lawful PSD permits under CAA § 165(a) in the interim. EPA, in turn, defends its interpretation of CAA § 165(a), as reinforced by CAA § 167, as unambiguously prohibiting construction of any major emitting facility without a PSD permit addressing newly regulated pollutants, regardless of whether the applicable SIP has been updated. Given this, EPA maintains that, pursuant to the analysis in *Coalition*, 684 F.3d at 144–48, petitioners lack Article III standing to challenge the rules, because, far from causing petitioners' injury, the challenged rules inure to petitioners' benefit by ensuring that a permitting authority existed to issue necessary PSD permits. Because the parties' arguments and petitioners' standing turn on the question of whether § 165(a) is self-executing, that is where we begin.

**A.**

Where Congress has spoken to the precise question at issue, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984). Based on the plain text of CAA § 165(a) and § 167, we agree with EPA that the Part C permitting requirements are self-executing and unambiguously require a PSD permit setting forth emission limitations for each pollutant subject to regulation under the Act

before a major emitting facility may be constructed, even when the applicable SIP has not been updated to include requirements for newly regulated pollutants.

CAA 165(a) provides, in relevant part:

> No major emitting facility on which construction is commenced after August 7, 1977, may be constructed in any area to which this part applies unless–
>
>> (1) a permit has been issued for such proposed facility in accordance with this part setting forth emission limitations for such facility which conform to the requirements of this part; [and]
>>
>> . . .
>>
>> (4) the proposed facility is subject to the best available control technology ["BACT"] for each pollutant subject to regulation under this chapter . . . .

42 U.S.C. § 7475(a). CAA § 167 directs that EPA "shall . . . take such measures . . . as necessary to prevent the construction or modification of a major emitting facility which does not conform to the requirements of this part, or which is . . . not subject to an implementation plan which meets the requirements of this part." *Id.* § 7477.

By its plain terms, CAA § 165(a) prohibits construction of a major emitting facility absent a Part C PSD permit that requires, *inter alia*, BACT for each pollutant subject to regulation under the Act. Its prohibition applies directly to stationary sources and requires that the permit "conform *to the requirements of this part*," *id.* § 7475(a)(1) (emphasis added),

rather than the requirements of an applicable implementation plan. As counsel for Texas acknowledged, "Section 165 says nothing about SIPs." Oral Arg. Tape, No. 11-1037, at 3:05–09 (May 7, 2013). And by requiring BACT for "*each* pollutant subject to regulation under this chapter," CAA § 165(a)(4), § 7475(a)(4) (emphasis added), CAA § 165 neither explicitly nor implicitly includes an exception for newly regulated pollutants.

On three occasions, this court has interpreted CAA § 165(a) as unambiguously prohibiting construction of major stationary sources without a PSD permit that meets all statutory requirements. In a pair of cases following EPA's initial implementation of the PSD program adopted in the 1977 amendments to the Act, the court stated that "[s]ection 165 by its terms explicitly and without qualification prohibits the construction of any major pollution-emitting facility . . . unless the substantive requirements of that section have been met," *Citizens to Save Spencer Cnty. v. EPA*, 600 F.2d 844, 853 (D.C. Cir. 1979), and that "[s]ection 165, in a litany of repetition, provides without qualification that each of its major substantive provisions shall be effective after 7 August 1977 with regard to each pollutant subject to regulation under the Act," *Alabama Power Co. v. Costle*, 636 F.2d 323, 406 (D.C. Cir. 1979). Most recently, in *Coalition*, 684 F.3d at 134, the court "agree[d] with EPA that its longstanding interpretation of the PSD permitting trigger is statutorily compelled." Because "greenhouse gases are now a 'pollutant subject to regulation under' the Act," § 165(a) itself required that "any 'major emitting facility' covered by the PSD program must install BACT for greenhouse gases." *Id.* at 133 (quoting CAA § 165(a)(4)). The court held that it "'must give effect to the unambiguously expressed intent of Congress,' *Chevron*, 467 U.S. at 843, which here requires PSD coverage for major emitters of any regulated pollutant." *Id.* at 134.

Granted, these opinions did not address the precise question here — whether CAA § 165(a) is self-executing and applies automatically to stationary sources with respect to newly regulated pollutants, or whether States with existing PSD programs may continue to issue lawful permits while they incorporate new pollutants into their SIPs. The court's repeated interpretation of the plain text of § 165(a), however, accords with EPA's interpretation here, *see SIP Call Rule*, 75 Fed. Reg. at 77,705 n.16. In particular, although the court had no occasion to address the SIP-related issues in *Coalition*, 684 F.3d at 149, it agreed with EPA's interpretation that, by "automatic operation" of the Act, *id.* at 144, "once the Tailpipe Rule took effect and made greenhouse gases a regulated pollutant under Title II of the Act, the PSD program automatically applied to facilities emitting over 100/250 tpy of greenhouse gases," *id.* at 133.

Like § 165(a)(1), § 167 by its plain terms grounds EPA's PSD enforcement authority in the requirements of Part C, rather than the requirements of an applicable implementation plan. In § 167, Congress mandated that EPA take necessary enforcement action to prevent construction or modification of a major emitting facility that either "does not conform to the [Part C] requirements . . . *or* . . . is not subject to an implementation plan which meets the requirements of this part." *Id.* (emphasis added). In authorizing EPA to take enforcement action in either circumstance, Congress distinguished between construction that itself violates Part C and construction that is unlawful because it occurs in an area that lacks a statutorily compliant SIP. That Congress authorized EPA to enforce the Part C requirements through § 167, independent of an applicable SIP, is further evident from the different text in the general enforcement provision of CAA § 113(a)(1), under which EPA is to initiate enforcement proceedings for violations of "any requirement or prohibition *of an applicable implementation plan*," 42 U.S.C.

§ 7413(a)(1) (emphasis added). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 24 (1983) (internal quotation marks and alteration omitted).

The Supreme Court has similarly interpreted CAA § 167. In *Alaska Department of Environmental Conservation v. EPA*, 540 U.S. 461, 484–85 (2004), the Court held that even where a State administers a Part C permitting program pursuant to an approved SIP, Congress vested EPA with a "broad oversight role" in § 167 to ensure that PSD permits comply with statutory requirements. The Court described the PSD permitting requirements as applying directly to stationary sources through CAA § 165(a) and, although recognizing that Alaska's SIP imposed analogous requirements, continued to look to Part C, rather than the SIP, for the governing provisions. *See id.* at 472–73, 484–85. Likewise, in *Sierra Club v. Jackson*, 648 F.3d 848, 856 (D.C. Cir. 2011), this court recognized that § 167 gave EPA discretion to take enforcement action where PSD permits issued pursuant to an approved SIP violated the requirements of § 165(a), describing State-issued permits that failed to incorporate subsequent EPA requirements as "not comply[ing] with [CAA § 165(a)], which forbids the construction of such facilities absent a PSD permit meeting the requirements of the Clear Air Act." *Id.* at 851–52.

The self-executing nature of the PSD permitting requirements is further reinforced by comparing Parts C and D. "Where Congress intended air quality programs to apply solely through State-approved SIPs, Congress used explicit language that . . . contrasts with the language of Section 165." Intervenors Br., No. 11-1037, at 20. Part D permits, for new sources of air pollution in non-attainment areas, may be issued only if the

permitting agency makes a determination "in accordance with regulations issued by [EPA] . . . consistent with the assumptions underlying *the applicable implementation plan*." CAA § 173(a)(1), 42 U.S.C. § 7503(a)(1) (emphasis added). By contrast, the Part C permitting requirements apply directly to stationary sources and prohibit construction unless "a permit has been issued for such proposed facility . . . setting forth emission limitations . . . which conform *to the requirements of this part*." CAA § 165(a)(1), 42 U.S.C. § 7475(a)(1) (emphasis added). Again, Congress distinguished between permitting requirements that operate through a SIP and those that operate through the Act itself, and in Part C chose the latter. *See Russello*, 464 U.S. at 24.

Texas and Wyoming assert this distinction between Part C and Part D permits is "absurd." States Reply Br., No. 11-1037, at 17. But "a bare assertion of absurdity cannot overcome the plain meaning of a statute: 'there must be evidence that Congress meant something other than what it literally said before a court can depart from plain meaning.'" *New York v. EPA*, 413 F.3d 3, 41 (D.C. Cir. 2002) (quoting *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1088 (D.C. Cir. 1996)). In *Coalition*, 684 F.3d at 142, the court concluded that the different text in Parts C and D was a significant indicator of congressional intent. Given the textual distinction between Part C and Part D, petitioners' reliance on *United States v. Cinergy Corp.*, 623 F.3d 455 (7th Cir. 2010), as support that CAA § 165(a) is not self-executing, is misplaced. In stating that "[t]he Clean Air Act does not authorize the imposition of sanctions for conduct that complies with a State Implementation Plan that the EPA has approved," *id.* at 458, the Seventh Circuit was addressing Part D permits and the general enforcement provision of CAA § 113(a)(1), not Part C permits and the PSD enforcement provision in CAA § 167. Petitioners also mistakenly rely on *General Motors Corp. v. United States*, 496 U.S. 530 (1990),

which held that EPA can enforce a previously approved SIP under CAA § 113 even where it had unreasonably delayed acting on a proposed SIP revision, *id.* at 540–41, and nowhere suggested that EPA lacked authority pursuant to § 167 to enforce the § 165(a) PSD permitting requirements directly.

Viewed alone and in context of other provisions of the Act, the plain text of CAA § 165(a) and § 167 compel the interpretation that the PSD permitting requirements are self-executing and prohibit construction of a major emitting facility without, *inter alia*, BACT technology for each pollutant subject to regulation under the Act, irrespective of applicable SIP provisions. Nothing in the text of § 165(a) or § 167, much less this court's opinions, delays operation of the Part C permitting requirements until a State revises its SIPs to incorporate a newly regulated pollutant. Once the *Tailpipe Rule* took effect and greenhouse gases became a pollutant subject to regulation under the Act, § 165(a) unambiguously prohibited a major emitting facility from commencing construction without a PSD permit restricting greenhouse gas emissions, and § 167 unambiguously authorized EPA to enforce that prohibition irrespective of SIP provisions. This understanding of congressional intent is reinforced by the different text for Part D permits and precedent of the Supreme Court and this court. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43.

**B.**

Petitioners offer no alternative interpretation of the text of CAA § 165(a) or § 167. Instead, they point to other provisions in the Act and invoke the "cooperative federalism" underlying the Act to support their position that the PSD permitting requirements do not apply to a facility with respect to a newly regulated pollutant until that pollutant is incorporated into the

applicable SIP. Although statutory design may "shed new light on congressional intent, notwithstanding statutory language that appears 'superficially clear,'" petitioners have "presented no persuasive evidence that Congress intended any meaning other than that suggested by a straightforward reading" of CAA § 165(a) and § 167. *NRDC v. Browner*, 57 F.3d 1122, 1127 (D.C. Cir. 1995). To the extent petitioners (and our dissenting colleague) maintain that EPA was bound to proceed in accordance with its regulation, 40 C.F.R. § 51.166(a)(6), and point to actions by EPA in other circumstances regarding PSD permitting that they claim are inconsistent with EPA's self-executing interpretation of CAA § 165(a), their reliance is misplaced. So is the States' invocation of the Tenth Amendment.

**1.** To support their interpretation that States with PSD programs in approved SIPs could continue to issue lawful permits that did not address greenhouse gases after January 2, 2011, petitioners rely on the following provisions of the Act:

• CAA § 110 prescribes the framework for States to implement and enforce the NAAQS and related requirements through SIPs. Among other things, each SIP must include a PSD permitting program and meet the applicable requirements of the Act's PSD program. CAA § 110(a)(2)(C), (J). On their face these provisions give States a clear role in administering the Part C PSD program, but they incorporate, rather than limit, the permitting requirements of CAA § 165(a). The provisions specify that SIPs must satisfy Part C's requirements; they do not suggest that a previously approved SIP trumps the plain text and self-executing nature of § 165(a) or limits EPA's enforcement authority under § 167. In *Spencer County*, 600 F.2d at 865–66, the court rejected an interpretation of the Act under which implementation of the CAA § 165(a) permitting requirements must await promulgation and approval of SIPs pursuant to CAA

§ 110. To the extent petitioners also rely on CAA § 110(i), it provides in relevant part that no action "modifying any requirement of an applicable implementation plan may be taken with respect to any stationary source" except through promulgation of a FIP under CAA § 110(c) or a SIP revision under CAA § 110(a). By its plain terms, subsection (i) limits EPA's and States' authority to *modify* the terms of a previously approved SIP without following prescribed procedures but does not prevent other self-executing statutory provisions from applying directly to stationary sources, irrespective of the applicable SIP. Petitioners offer no basis on which the court can ignore the plain text of CAA § 165(a) and § 167.

• CAA § 161 provides that "each applicable implementation plan shall contain emission limitations and such other measures as may be necessary, as determined under regulations promulgated under this part, to prevent significant deterioration of air quality." 42 U.S.C. § 7471. Petitioners maintain this provision confirms that the PSD permitting requirements are not self-executing, but rather apply only through SIPs adopted pursuant to EPA regulations. Like CAA § 110(a)(2)(C) and (J), however, CAA § 161 merely specifies the minimum requirements of a SIP PSD program. Nothing in CAA § 161 restricts operation of other statutory PSD provisions, such as the CAA § 165(a) permitting requirements, but instead requires that SIPs contain *additional* regulatory measures that EPA determines are necessary to meet the goals of the PSD program. As this court has recognized, "[n]othing in the plain language of the statute limits the measures in the [SIP] to the preconstruction permit process," rather, § 161 "reflects an understanding that other measures might be required — and are within the authority conveyed by the Act." *Alabama Power*, 636 F.2d at 362. Thus, while CAA § 110(a)(2)(C) and (J) require that SIPs satisfy all applicable Part C PSD provisions,

CAA § 161 requires that SIPs satisfy any other measures that EPA promulgates in regulations.

• CAA § 166 requires EPA to conduct a study and promulgate PSD regulations for new NAAQS pollutants, and gives States twenty-one months to revise their SIPs accordingly. 42 U.S.C. § 7476(a)–(b). Reliance on this provision is foreclosed by circuit precedent. In *Coalition*, 684 F.3d at 143–44, the court rejected a similar argument — that to regulate new pollutants through the PSD program, EPA must go through the § 166 process — stating that it "fails on its face" because CAA § 166 applies only to new NAAQS pollutants and thus does not apply to non-NAAQS pollutants like greenhouse gases. In *Alabama Power*, 636 F.2d at 405–06, the court rejected as "contradicted by the plain language of section 165," the position that the effective date of the PSD permitting requirements should be delayed for most pollutants until EPA promulgated regulations pursuant to CAA § 166.

• CAA § 168 delayed the effective date of most PSD statutory provisions following enactment of the 1977 CAA amendments, with certain exceptions, "[u]ntil such time as an applicable implementation plan is in effect for any area." 42 U.S.C. § 7478(a). So, petitioners maintain, when Congress intended to impose new PSD requirements and bypass SIP revision procedures, it did so explicitly, as in the exceptions in CAA § 168(b). This contention fails for two reasons. First, the Supreme Court has recognized that CAA § 168 was simply a "temporary measure" governing immediate implementation of the 1977 amendments, *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 576 n.6 (2007). As such, it does not apply to pollutants newly subject to regulation in the future. Second, even with respect to implementation of the 1977 amendments, this court in *Spencer County*, 600 F.2d at 860–66, rejected an interpretation that CAA § 168 delayed the effective date of the

CAA § 165(a) permitting requirements until EPA approved SIP revisions. Although recognizing inconsistency in the text of § 165(a) and § 168, *id.* at 860–63, the court upheld EPA's interim regulatory framework in which § 165(a) was to be implemented as quickly as possible, concluding EPA had adopted a reasonable accommodation of the two provisions, *id.* at 890. Importantly, unlike in *Spencer County*, petitioners here identify no statutory provision that conflicts with the plain text and self-executing interpretation of CAA § 165(a) regarding newly regulated pollutants and applicable SIPs. Indeed, *Spencer County* appears to preclude petitioners' interpretation of CAA § 165(a) because if the PSD permitting requirements operated only through an approved SIP, there would have been no conflict between § 165(a) and § 168.

**2**. The States maintain that EPA's interpretation of CAA § 165(a) as self-executing upsets the cooperative federalism embodied in the Act. In enacting the statute Congress found that "air pollution prevention (that is, the reduction or elimination, through measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is the primary responsibility of States and local governments." CAA § 101(a)(3), 42 U.S.C. 7401(a)(3). Congress also found that "Federal . . . leadership is essential for the development of cooperative Federal, State, regional, and local programs to prevent and control air pollution." CAA § 101(a)(4), 42 U.S.C. § 7401(a)(4). Accordingly, States are to determine in the first instance how to implement the federally established NAAQS and related emission limitations based on local conditions and needs, but EPA remains "the ultimate supervisor, responsible for approving [SIPs] and for stepping in, should a state fail to develop or to enforce an acceptable plan." *Duquesne Light Co. v. EPA*, 698 F.2d 456, 471 (D.C. Cir. 1983).

Put otherwise, although pollution control may be the primary responsibility of States, Congress required federal regulation and enforcement in specific circumstances. Where a State fails to act or submits a SIP that does not meet minimum requirements of the Act, Congress required EPA to issue a FIP under CAA § 110(c)(1) to implement emission requirements within that State and maintain federal standards. Similarly, Congress charged EPA with regulating new source performance standards under CAA § 111, Hazardous Air Pollutants under CAA § 112, and motor vehicle emission standards under CAA § 202. *See Train v. NRDC*, 421 U.S. 60, 79 n.16 (1975). Self-executing permitting requirements with respect to newly regulated pollutants under CAA § 165(a) are thus not inconsistent with the cooperative federalism scheme enacted by Congress.

In the PSD context, the Supreme Court has acknowledged that "Congress . . . vested EPA with explicit and sweeping authority to enforce CAA 'requirements' relating to the construction and modification of sources under the PSD program," noting that Congress "expressly endorsed an expansive surveillance role for EPA in two independent CAA provisions," referring to enforcement actions pursuant to CAA § 113(a)(5) and § 167. *Alaska Dep't of Envtl. Conservation*, 540 U.S. at 490. This still left, under EPA's interpretation of the ambiguous term BACT, considerable leeway to the permitting authority, which EPA acknowledged. *Id.* But, as EPA pointed out, Congress had determined federal PSD oversight was necessary to prevent States from improperly competing for industry by adopting more permissive pollution controls. *See id.* at 486. One of Congress's stated goals for the PSD program was to ensure that economic growth occurred "in a manner consistent with the preservation of existing clean air resources." CAA § 160(3), 42 U.S.C. § 7470(3). The same rationale explains why Congress made CAA § 165(a) self-executing for

newly regulated pollutants: otherwise, States would have a perverse incentive to delay incorporating new pollutants into revised SIPs in order to compete for industry in the interim. "The states, in sum, are to tailor [federally established ambient air] standards to their own conditions, but EPA is to ensure national uniformity where needed, for example, to ensure that states do not compete unfairly for industry . . . ." *Duquesne*, 698 F.2d at 471.

The rulemaking record demonstrates that EPA repeatedly acted to accommodate States within the scope of the statutory scheme enacted by Congress. In the *SIP Call Rule*, EPA emphasized the primacy of SIPs and its preference for States to serve as the PSD permitting authority, acting only when necessary to ensure a permitting authority existed for affected sources and then offering to delegate its FIP authority to the States. *Id.* at 77,717. Neither Texas nor Wyoming has suggested that revising their SIPs to incorporate PSD permitting for greenhouse gases would require independent balancing of local conditions and needs. As EPA observed, a corrective SIP revision could constitute a simple addition of greenhouse gases to the list of pollutants subject to PSD permitting. *See SIP Call Rule*, 75 Fed. Reg. at 77,713. Indeed, most States' PSD programs automatically update to include newly regulated pollutants like greenhouse gases. *See id.* at 77,702. Others subject to the *SIP Call Rule*, including Respondent-Intervenor Connecticut, worked cooperatively with EPA to revise their SIPs and to ensure permitting continuity promptly and as needed. *See, e.g.*, *id.* at 77,710. Texas alone did not, informing EPA that it had "no intention" of revising its SIP because of its disagreement with EPA's regulation of greenhouse gases under the Act. Texas August 2010 Letter. Invoking "cooperative federalism" in these circumstances has a hollow ring.

**3.** Finding no support in the Act itself for their position that the PSD permitting requirements apply only pursuant to an applicable SIP, petitioners contend that interpreting CAA § 165(a) as self-executing is inconsistent with EPA's regulation on amendments to the PSD requirements for SIPs, 40 C.F.R. § 51.166(a)(6). They maintain that under this regulation, States can continue to issue valid PSD permits pursuant to previously approved SIPs for up to three years without incorporating newly regulated pollutants.

Section 51.166(a)(6), Amendments, provides:

> (i) Any State required to revise its implementation plan *by reason of an amendment to this section . . .* shall adopt and submit such plan revision to [EPA] for approval no later than 3 years after such amendment is published in the Federal Register.
> . . .
>
> (iii) Any revision to an implementation plan *that an amendment to this section required* shall take effect no later than the date of its approval and may operate prospectively.

40 C.F.R. § 51.166(a)(6)(i), (iii) (emphasis added).

There is no conflict between CAA § 165(a)'s self-executing nature and EPA's regulation. The SIP revisions at issue were not "required . . . by reason of an amendment to" 40 C.F.R. § 51.166, but rather by automatic operation of the Act itself. *See SIP Call Rule*, 75 Fed. Reg. at 77,707–08. As EPA interprets § 51.166(a)(6), it applies to SIP revisions that would not have been required but for an amendment to § 51.166, such as EPA's revision in 2002 of the Part C and Part D program requirements for SIPs. *See* 67 Fed. Reg. 80,186, 80,240-41 (Dec. 31, 2002)

("*Prevention of Significant Deterioration and Nonattainment New Source Review Requirements*" ("2002 Rule")). Here, as EPA explained in the *SIP Call Rule*, 75 Fed. Reg. at 77,707–08, States were required to revise their SIPs even absent the amendments to § 51.166 in the *Tailoring Rule*; those amendments merely alleviated States' PSD permitting burdens. *See also Error Correction Rule*, 76 Fed. Reg. at 25,193–94. The court effectively confirmed EPA's explanation in concluding that petitioners lacked Article III standing to challenge the *Tailoring Rule*. *Coalition*, 684 F.3d at 146. EPA's interpretation of its regulation as inapplicable here is therefore "controlling" because the interpretation is neither "plainly erroneous [n]or inconsistent with the regulation," and there is no reason to suspect that it "does not reflect the agency's fair and considered judgment on the matter in question." *Auer v. Robbins*, 519 U.S. 452, 461–62 (1997) (internal quotation marks omitted); *see also Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012).

Our dissenting colleague has a different interpretation of the regulation, which he asserts "resolves this case." Dissent at 2. He reaches this conclusion ignoring the plain text of the Act. Consequently his reasoning is flawed. For example, he finds no distinction between SIP revisions triggered by automatic operation of the Act and those required solely by EPA's amendments to its regulations. But Congress itself has codified the distinction. In CAA § 110(a)(2)(C) and (J), Congress required that SIPs satisfy all applicable statutory PSD provisions; in CAA § 161, Congress separately required that SIPs satisfy "*other measures*" that EPA promulgates in regulations, 42 U.S.C. § 7471 (emphasis added). According to our colleague, in either instance, "the changes to the PSD regulations still ultimately are what require the changes to the SIP." Dissent at 4. This ignores the statutory text as well as the law of the circuit that States were "required to issue permits [for

greenhouse gas emissions] not because of anything EPA did in the Timing and Tailoring Rules, but by automatic operation of the statute," *Coalition*, 684 F.3d at 146. As this court understood Congress's mandate, even if EPA never amended § 51.166 in the Tailoring Rule, States still would have been obligated to update their SIPs to incorporate greenhouse gases in order to issue valid PSD permits. This holding forecloses our dissenting colleague's assertion. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc). Indeed, he has acknowledged that "[t]his [c]ourt has ruled that the *statute* requires pre-construction and operating permits for stationary sources that emit or have the potential to emit certain specified amounts of an air pollutant, including carbon dioxide." *Ctr. for Biological Diversity v. EPA*, – F.3d –, 2013 WL 3481511, at *9 (D.C. Cir. 2013) (Kavanaugh, J., concurring) (emphasis added).

Additionally, the Supreme Court has instructed that courts must defer to an agency's interpretation of its regulation unless it is "plainly erroneous or inconsistent with the regulation." *Auer*, 519 U.S. at 461–62. EPA's interpretation is neither. The dissent cites the preamble to the 2002 Rule, which, in making extensive changes to the regulatory PSD requirements, extended the SIP revision timeline in § 51.166(a)(6)(i) to three years. *See* 67 Fed. Reg. at 80,240-41. The significant SIP revisions required as a result of the 2002 Rule would not have been required but for the regulatory amendments. *See id.* at 80,240. By contrast, on the same page of the preamble to the 2002 Rule, EPA reiterated its longstanding interpretation that "[t]he PSD program applies automatically to newly regulated . . . pollutants." *Id.* Thus, the 2002 Rule is consistent with EPA's interpretation that the three-year timeline in § 51.166(a)(6)(i) applies to SIP revisions that are required solely "by reason of an amendment" to the regulation, whereas the PSD permitting requirement "applies automatically" to newly regulated pollutants.

Most fundamentally, our dissenting colleague fails to account for the statutory provisions that compel the self-executing conclusion in this case. The issue is not whether "*the regulation* contemplates a construction moratorium in the period until the State revises its SIP," Dissent at 6 (emphasis added), but rather whether *the Act itself* requires one with respect to newly regulated pollutants. Our colleague asserts that "Section 165 applies only through the relevant SIP, not directly to sources." Dissent at 8. This assertion is belied the plain text of both CAA § 165 and § 167, as repeatedly interpreted by this court. He further suggests that it would "make no sense" for the Act to create a role for States in implementing the PSD program but also require that newly regulated pollutants be incorporated into PSD permitting as soon as they become subject to regulation. Dissent at 8. This ignores that Congress, in enacting the PSD program as part of the 1977 Amendments, intended to eliminate perverse incentives for States to compete improperly for industry, as highlighted by the Supreme Court in *Alaska Dep't of Envtl. Conservation*, 540 U.S. at 486. Regardless of how our dissenting colleague interprets 40 C.F.R. § 51.166(a)(6)(i), or how EPA may have applied the regulation in the past, the Act itself prohibited the construction of any major emitting facility after January 2, 2011 without a PSD permit limiting greenhouse gas emissions. "[A] valid statute always prevails over a conflicting regulation," *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 829 (D.C. Cir. 2006), and a regulation can never "trump the plain meaning of a statute," *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 11 (D.C. Cir. 2002). As EPA explained in the *Error Correction Rule*, 76 Fed. Reg. at 25,193, "because [40 C.F.R. § 51.166(a)(6)] is a regulation, it cannot, no matter how it is interpreted, override the CAA requirements that apply PSD requirements to [greenhouse gas]-emitting sources so that those CAA requirements do not take effect as of January 2, 2011." Given that the self-executing nature of the Part C PSD

permitting requirements is compelled by the plain text of CAA § 165(a) and § 167, reliance on the regulation to undercut Congress's mandate is misplaced.

**4.** The other EPA actions that petitioners (and our dissenting colleague) claim are inconsistent with EPA's self-executing interpretation of CAA § 165(a) do not advance their position. Petitioners refer specifically to EPA's implementing new and revised NAAQS for particulate matter; promulgating phased-in PSD permitting through the *Tailoring Rule*; and grandfathering a PSD permit to the Avenal Energy Project in California. To the extent petitioners suggest these actions may be inconsistent with Congress's mandate in CAA § 165(a), the court no less than EPA is bound to adhere to Congress's plain command, *see Chevron*, 467 U.S. at 842–43. Petitioners point to no judicial sanction of EPA's purportedly inconsistent application of the PSD permitting requirements in these other contexts.

Reliance on these actions is misplaced, in any event, for EPA justified each of its other actions on grounds inapplicable here. To the extent EPA allowed States to continue implementing their existing PSD programs while they revised SIPs to incorporate different forms of particulate matter, *see* Dissent at 6-7, it did so on the express basis that the SIPs and PSD permits already regulated particulate matter in some form. *See* 73 Fed. Reg. 28,321, 28,340–41 (May 16, 2008) ("*New Source Review Program for Fine Particulate Matter*"); 52 Fed. Reg. 24,672, 24,682–83 (July 1, 1987) ("*Regulations for Implementing Revised Particulate Matter Standards*"). (By contrast, here, the preexisting SIPs of several states failed to regulate greenhouse gases altogether.) Thus, in promulgating PSD regulations for fine particulate matter, EPA interpreted CAA § 165(a) to be self-executing, 73 Fed. Reg. at 28,324, 28,340, but determined that States could continue to implement

their existing PSD programs because emissions limitations for coarse particulate matter served as an adequate surrogate for fine particulate matter, *id.* at 28,341. Petitioners here neither challenged this surrogate approach before EPA, *see* CAA § 307(d)(7)(B), 42 U.S.C. § 7607(d)(7)(B), nor maintain that any similar surrogate exists for greenhouse gases. Similarly, EPA justified the phased-in approach of the *Tailoring Rule* on the administrative law doctrines of "absurd results," "administrative necessity," and "one-step-at-a-time," *see Tailoring Rule*, 75 Fed. Reg. at 31,516, none of which petitioners maintain would support delaying the PSD permitting requirements until the several States revised their inadequate SIPs. Finally, EPA grandfathered the PSD permit for the Avenal Energy Project pursuant to CAA § 165(c), which provides that "[a]ny completed permit application . . . shall be granted or denied not later than one year after the date of filing of such completed application"; Avenal had submitted a completed permit application to EPA more than one year before the new greenhouse gas requirements took effect on January 2, 2011 — circumstances that petitioners do not identify here.

**5**. Finally, State petitioners invoke the Tenth Amendment to the Constitution, which provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. AMEND X. They contend that EPA's "requirement that States cede their rights and carry out federal policy, or face unprecedented and unlawful sanctions [in the form of a construction moratorium,] constitutes coercion and commandeering of the organs of State government, in violation of the Tenth Amendment." States Br., No. 11-1037, at 37. They urge the court to apply the canon of constitutional avoidance and construe CAA § 165(a) as not self-executing.

The States' reliance on the Tenth Amendment is met by Supreme Court precedent repeatedly affirming the constitutionality of federal statutes that allow States to administer federal programs but provide for direct federal administration if a State chooses not to administer it. *See, e.g.*, *New York v. United States*, 505 U.S. 144, 167–68, 173–74 (1992) (upholding access incentives of the Low-Level Radioactive Waste Policy Act); *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 288 (1981) (upholding the Surface Mining Control and Reclamation Act). Under the challenged rules, the thirteen States found to have "substantially inadequate" SIPS could revise their SIPs to incorporate newly regulated pollutants by January 2, 2011, or allow EPA to regulate those emissions pursuant to a FIP until their revised SIPs were approved by EPA, which EPA pledged to do expeditiously, *SIP Call Rule*, 75 Fed. Reg. at 77,716–17. State petitioners concede that direct federal regulation of greenhouse gas emissions is within Congress's authority under the Commerce Clause. Contrary to their suggestion, the circumstance here are not comparable to Congress's coercive financial threat to withhold all Medicaid funds from States in the Patient Protection and Affordable Care Act provision challenged under the Spending Clause in *National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566, 2601–06 (2012) (Roberts, C.J., joined by Breyer and Kagan, J.J.); *see also id.* at 2659–66 (joint dissenters Scalia, Kennedy, Thomas, and Alito, J.J.). Even assuming a temporary construction delay of up to twelve months for new major emitting facilities is significant, State petitioners make no effort to demonstrate this delay is of the same magnitude and nature as the Medicaid expansion provision that would strip "over 10 percent of a State's overall budget," *id.* at 2605. Unlike the Medicaid provision, which was held unconstitutional because it threatened to withhold all existing Medicaid funds from States unwilling to carry out the expansion, *id.* at 2603–08, EPA assumed authority over only the

greenhouse gas portion of PSD permits and left the rest of the States' SIPs and permitting authority in place. Therefore, the constitutional avoidance canon does not apply, much less require us to alter our interpretation of the plain text of CAA § 165(a) and § 167.

## III.

Having concluded the Part C PSD permitting requirements are unambiguously self-executing with respect to newly regulated pollutants, and apply directly to major stationary sources irrespective of the applicable SIP, we turn to the question of standing.

Petitioners challenge EPA's *SIP Call Rule*, *Failure Finding Rule*, and *FIP Rule* on two primary grounds. They contend, first, that EPA may not find a SIP to be "substantially inadequate" pursuant to CAA § 110(k)(5) based on a requirement that did not exist at the time the State submitted its SIP to EPA for approval; and second, that pursuant to CAA § 110(a) and 40 C.F.R. § 51.166(a)(6)(i), States should have been given at least three years to revise their SIPs to incorporate the new greenhouse gas requirements. State Petitioners further challenge the *SIP Call Rule* as procedurally defective because Wyoming was not included among the States with presumptively inadequate SIPs in the *Proposed SIP Call Rule*. Texas and industry groups also challenge the *Interim* and *Error Correction Rules* on both procedural and substantive grounds, contending that EPA improperly invoked the "good cause" exception to notice and comment procedures in promulgating the *Interim Error Correction Rule*, and exceeded its authority under CAA § 110(k)(6) when it retroactively disapproved Texas's PSD SIP provisions.

To establish Article III standing, a petitioner must demonstrate it has suffered a concrete and particularized injury that is imminent and not conjectural, that was caused by the challenged action, and that is likely to be redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The petitioner bears the burden of averring facts in its opening brief establishing these elements. *Sierra Club v. EPA*, 292 F.3d 895, 899–901 (D.C. Cir. 2002). In *Coalition*, 684 F.3d at 146, the court held, after determining the PSD permitting requirements applied to major emitters of greenhouse gases by automatic operation of the Act, that State and industry petitioners lacked Article III standing to challenge the *Timing* and *Tailoring Rules* because those rules "actually mitigate[d] Petitioners' purported injuries." The court observed that "Industry Petitioners were regulated and State Petitioners required to issue permits not because of anything EPA did in the Timing and Tailoring Rules, but by automatic operation of the statute." *Id.* Thus, "[i]f anything, vacature of the [Rules] would significantly exacerbate Petitioners' injuries." *Id.*

The same principle applies here. Because CAA § 165(a) is self-executing, construction of a major emitting facility could not commence as of January 2, 2011 without a PSD permit limiting greenhouse gas emissions. The challenged rules operated to fill a permitting gap in several States and thereby ensure that a permitting authority existed to issue necessary PSD permits. *See, e.g.*, *SIP Call Rule*, 75 Fed. Reg. at 77,700. Vacating the challenged rules would mean neither those States nor EPA could issue greenhouse gas PSD permits, and construction of a major emitting facility could not proceed in those States.

Industry petitioners premise their standing on the contention that without the challenged rules industry would not have been subject to PSD requirements for greenhouse gases in those

several States until they revised their SIPs and EPA approved them. But because by its plain text CAA § 165(a) is self-executing, industry petitioners' purported injury was caused by automatic operation of the Act, not the challenged rules. The challenged rules mitigated the injury that otherwise would have occurred when industry petitioners could not obtain lawful PSD permits in those States. Counsel for industry petitioners conceded at oral argument that, if CAA § 165(a) was self-executing, his clients lacked Article III standing to challenge rules that enabled issuance of necessary permits. Oral Arg. Tape, No. 11-1037, at 40:25–41:05 (May 7, 2013).

State petitioners contend the challenged rules injured their quasi-sovereign interests in regulating air quality within their borders. Again, however, the claimed injury was caused by automatic operation of CAA § 165(a), rather than the challenged rules, and thus vacating them would not redress the State petitioners' injury. Although State petitioners maintain the challenged rules "supplanted" their right to issue valid PSD permits while they revised their SIPs, States Br., No. 11-1037, at 15; Texas Br., No. 10-1425, at 19, the rules actually supplemented the States' permitting authority: in issuing FIPs, EPA assumed authority over only the greenhouse gas portions of the PSD permits until affected States revised their SIPs, and EPA offered to delegate this authority to those States. *See FIP Rule*, 75 Fed. Reg. at 82,251; *Interim Error Correction Rule*, 75 Fed. Reg. at 82,457–58. Neither the States' briefs nor their counsel at oral argument identified a concrete redressable injury or explained how the States had Article III standing to challenge the rules if CAA § 165(a) was self-executing, in light of this court's conclusion in *Coalition*, 648 F.3d at 144–46, regarding the lack of standing to challenge the *Timing* and *Tailoring Rules*. By post-argument letter of May 20, 2013 Texas's counsel states the *SIP Call Rule* directly injured the State's sovereign interest in the continued validity of its domestic law and its continued

authority to regulate emissions from sources within its borders. To the extent these are cognizable injuries, they were caused by the Act, not the challenged rules: vacatur of the rules would not restore either State's ability to issue necessary PSD permits with greenhouse gas requirements for construction of major emitting facilities but would result in a construction moratorium until they submitted revised SIPs that EPA approved. State petitioners have not suggested a moratorium would redress their claimed injuries.

Put otherwise, because CAA § 165(a) is self-executing, the challenged rules determined the timeline for affected States to submit required SIP revisions and established how soon EPA could promulgate a FIP to enable issuance of necessary greenhouse gas PSD permits. State petitioners do not assert a concrete injury based on EPA's chosen timeline. And State petitioners fail to show how the "special solicitude" due to States in addressing their standing to ensure enforcement of the Act, *Massachusetts v. EPA*, 549 U.S. at 520, applies when they attempt to block operation of the Act, *see id.* at 520 n.17. In any event, "nothing in the Court's opinion [in *Massachusetts v. EPA*] remotely suggests that states are somehow exempt from the burden of establishing a concrete and particularized injury in fact." *Coalition*, 684 F.3d at 148.

Accordingly, because "[p]etitioners have failed to establish that the [challenged] Rules caused them 'injury in fact,' much less injury that could be redressed by the Rules' vacatur," *id.* at 146, we must dismiss the petitions for lack of jurisdiction.

KAVANAUGH, *Circuit Judge*, dissenting: Under the federal Clean Air Act, States control air pollution within their borders by adopting State Implementation Plans, known as SIPs. When EPA issues new national air pollution regulations, States are required to update their SIPs accordingly. If a State does not update its SIP in a timely manner, EPA may impose a Federal Implementation Plan, or FIP, for that State.

In this case, EPA issued new regulations governing emissions of greenhouse gases. EPA's action required that States in turn revise the portions of their SIPs incorporating the Prevention of Significant Deterioration (PSD) program, which requires construction permits for large construction projects. EPA set short deadlines for States to update their SIPs. Texas and Wyoming did not meet their deadlines, and EPA imposed FIPs for Texas and Wyoming. Texas, Wyoming, and Industry Petitioners[1] challenge EPA's action.

As a starting point, the parties here all agree that the States must revise their SIPs to incorporate greenhouse gas regulations. Texas, Wyoming, and Industry Petitioners argue, however, that an EPA regulation expressly gives States up to three years to revise their SIPs. Moreover, Texas and Wyoming assert that, during those three years, they have authority to issue valid PSD construction permits under their

---

[1] Industry Petitioners include Utility Air Regulatory Group, National Mining Association, Peabody Energy Company, SIP/FIP Advocacy Group, Coalition for Responsible Regulation, Inc., Industrial Minerals Association – North America, National Cattlemen's Beef Association, Great Northern Project Development, L.P., Rosebud Mining Company, Alpha Natural Resources, Inc., Chase Power Development, LLC, Texas Chemical Council, Texas Association of Business, and Texas Association of Manufacturers.

old SIPs, which do not consider a source's greenhouse gas emissions.

In my view, this case is straightforward. The relevant EPA regulation plainly gives States three years to revise their SIPs whenever new pollutants, like greenhouse gases, are regulated under EPA's PSD regulations. *See* 40 C.F.R. § 51.166(a)(6)(i). During that time, States may still issue PSD construction permits.

EPA also relied on an alternative ground in imposing a FIP on Texas before Texas's 12-month deadline for revisions had even passed. EPA retroactively disapproved Texas's pre-existing SIP because, according to EPA, the SIP was flawed when EPA approved it 18 years earlier. EPA claims that Texas's SIP was flawed because the SIP neither (i) updates automatically to incorporate new federal regulations, such as the greenhouse gas regulations, nor (ii) provides express assurances that the State will update its plan as necessary whenever a new EPA regulation issues. But neither the Act nor EPA regulations require either an automatically updating SIP or assurances that the State will reflexively update its plan. So Texas's SIP was not flawed when EPA approved it 18 years earlier, and it cannot be retroactively disapproved on that basis.

For those reasons, I would vacate the relevant EPA orders.

I

An EPA regulation, 40 C.F.R. § 51.166(a)(6)(i), resolves this case. That regulation gives a State without an automatically updating SIP (that is, without a SIP that

automatically incorporates new EPA regulations) three years to revise its SIP when EPA changes the PSD requirements.

The regulation states quite plainly: "Any State required to revise its implementation plan by reason of an amendment to this section [with certain specified exceptions] shall adopt and submit such plan revision to the Administrator for approval no later than 3 years after such amendment is published in the Federal Register." 40 C.F.R. § 51.166(a)(6)(i). In various forms, this regulation has been in place since 1980, with the relevant time period increased in 2002 from nine months to three years. *See* 67 Fed. Reg. 80,186, 80,241 (Dec. 31, 2002); 45 Fed. Reg. 52,676, 52,687 (Aug. 7, 1980). Under the regulation, States with SIPs that do not automatically incorporate newly covered pollutants – for example, Wyoming and Texas – have three years to submit new SIPs when EPA changes the relevant air pollution regulations. In the interim, those States are able to issue construction permits under their old SIPs.

Here, however, Texas and Wyoming were not given three years to revise their SIPs. And EPA did not allow States to issue valid construction permits under their old SIPs. Put simply, EPA did not follow its own regulation. EPA could of course withdraw or amend the regulation setting forth the three-year revision deadline, but it has not done so. Therefore, the regulation applies. *See, e.g.*, *Transactive Corp. v. United States*, 91 F.3d 232, 238 (D.C. Cir. 1996) (agency cannot "ignore its own regulation"); *Panhandle Eastern Pipe Line Co. v. FERC*, 613 F.2d 1120, 1135 (D.C. Cir. 1979) ("It has become axiomatic that an agency is bound by its own regulations. The fact that a regulation as written does not provide [the agency with] a quick way to reach a desired result does not authorize it to ignore the regulation or label it 'inappropriate.' ") (footnote omitted).

EPA has offered three explanations for why the regulation does not bar its actions here. In my view, none suffices to overcome the plain language of Section 51.166(a)(6)(i).

*First*, EPA has said that the changes States had to make to their SIPs in this case were not "by reason of" changes to EPA's PSD regulations, as the language of Section 51.166(a)(6)(i) demands to trigger the three-year revision period. I disagree.

EPA changed its PSD regulations to encompass greenhouse gases. By reason of that change, States' SIPs must be revised. So by its terms, Section 51.166(a)(6)(i) applies. To be sure, EPA changed its PSD regulations in part because the *statute* required EPA to alter its PSD regulations once greenhouse gases were considered a covered pollutant. That is because the statute itself requires the PSD program to cover any pollutant subject to regulation under the Act. *See Coalition for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 143 (D.C. Cir. 2012).

But regardless of whether EPA changes its PSD regulations as a matter of statutory *discretion* or as a matter of statutory *dictate*, the resulting SIP revisions are required "by reason of an amendment to" the PSD regulations. Where the change to the PSD regulations is a matter of statutory dictate, the causal chain may begin with the statute, which in turn requires EPA to change the PSD regulations, which in turn requires changes to the SIP. But the changes to the PSD regulations still ultimately are what require the changes to the SIP. I think it's plainly incorrect to say – as EPA does and the majority opinion accepts – that Section 51.166(a)(6)(i) and its "by reason of" requirement apply when EPA makes a discretionary change to the PSD regulations but does not

apply when EPA makes a statutorily mandated change to the PSD regulations. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997). EPA's position is a bit like saying that a car accident victim wasn't injured by reason of the other driver's negligence but rather by reason of the car's poor design when, in fact, the victim was injured by reason of both causes. So too here.

Moreover, the language in the preamble to EPA's 2002 amendment to Section 51.166(a)(6)(i), which changed the relevant time for a State to update its SIP from nine months to three years, says simply that Section 51.166(a)(6)(i) applies whenever EPA "revise[s]" the PSD regulations. 67 Fed. Reg. at 80,241. In other words, in 2002 when EPA explained this regulation, EPA itself did not think the "by reason of" language somehow drew a distinction between (i) cases involving *discretionary* changes to the PSD regulations and (ii) cases involving statutorily *mandated* changes to the PSD regulations. Instead, EPA said that Section 51.166(a)(6)(i) applies whenever EPA revises the PSD regulations.

In addition, if EPA were right here, then the three-year time period in Section 51.166(a)(6)(i) for a State to update its SIP should not have applied when EPA changed or revised the National Ambient Air Quality Standards in the past. After all, in those cases, once EPA decided to revise the NAAQS, the required SIP changes were statutorily mandated, not just a matter of EPA discretion. Yet tellingly, in those cases EPA actually cited and applied Section 51.166(a)(6)(i) and gave States the required time to comply, as set forth in the regulation. *See, e.g.*, 73 Fed. Reg. 28,321, 28,341 (May 16, 2008) (applying Section 51.166(a)(6)(i) when the $PM_{2.5}$ NAAQS were updated); 52 Fed. Reg. 24,672, 24,682 (July 1, 1987) (applying Section 51.166(a)(6)(i) when the $PM_{10}$ NAAQS were instituted). So EPA's interpretation of the

regulation here not only is contrary to the regulation's plain terms and EPA's own prior descriptions, but also is flatly inconsistent with how EPA has previously applied the regulation.

*Second*, EPA suggests that, regardless of how much time a State takes to revise its SIP, the regulation contemplates a construction moratorium in the period until the State revises its SIP. That is, the State cannot issue valid permits under its existing SIP in the interim. This is a very weak argument.

Most importantly, the regulation by its terms does not impose a construction moratorium during the period in which a State without an automatically updating SIP is revising its SIP. And it would be borderline nonsensical for the agency to give a State three years to revise its SIP to meet new PSD requirements – as EPA's regulation expressly does – only then to simultaneously tell the State that permits must meet the new PSD requirements during those three years. A State that took advantage of the three-year period would do so at the expense of bringing major construction in the State to a grinding halt. As I see it, it does not make any sense to read the regulation to silently impose such a ridiculous regime.

Moreover, in the past, EPA has not barred States from issuing permits during this interim period. EPA has traditionally allowed States without automatically updating SIPs to issue permits under their existing SIPs during the interim period. *See, e.g.*, 60 Fed. Reg. 55,792, 55,794 (Nov. 3, 1995) ("[T]he implementation date for States with SIP-approved PSD permitting programs . . . will be the date on which EPA approves each revised State PSD program containing the PM-10 increments. In accordance with 40 CFR 51.166(a)(6)(i), each State with SIP-approved PSD programs was required to adopt the PM-10 increment

requirements within nine months [the period of time the regulation then required] of the effective date . . . .”); 52 Fed. Reg. at 24,682 (“States with approved PSD SIP’s will have 9 months” – the period of time the regulation then required – “from the effective date of today’s PSD amendments to revise their SIP’s for $PM_{10}$ and submit them to EPA for approval. See revised section 51.166(a)(6) [formerly section 51.24(a)(6)]. *In the meantime, the EPA expects these States to continue implementing their existing programs for particulate matter.*”) (emphasis added).

In the past, in other words, EPA has recognized and adhered to the plain language of Section 51.166(a)(6)(i). But here, EPA has basically re-interpreted the regulation to be meaningless. As a matter of basic administrative law, we cannot countenance the agency’s blatant disregard of the text of its own regulations. *See Auer*, 519 U.S. at 461; *Panhandle Eastern Pipe Line Co.*, 613 F.2d at 1135 (agency does not have “authority to play fast and loose with its own regulations”).

*Third*, in its brief and at oral argument, EPA’s counsel ultimately asserted that the regulation cannot trump the statute, and EPA’s counsel actually suggested that EPA’s own regulation was invalid. But the regulation remains binding law, and States and Industry have not challenged it in this case – rather, they have invoked and relied on it. In this posture, EPA cannot disclaim the validity of its own regulation. If EPA thinks its own regulation violates the statute, it can of course endeavor to amend or withdraw it. Until then, however, States are entitled to rely on it, and EPA must follow it.

In any event, EPA’s regulation is not invalid under the statute. Although I think the statute gives EPA discretion to

amend the regulation so as to shorten the lag time for States to revise their SIPs, the statute certainly does not forbid this current regulation. In one form or another, the regulation has been on the books and applied by EPA for some 30 plus years. And the regulation represents an entirely sensible and reasonable reading of the statute.

EPA's counsel contended, however, that Section 165 of the Clean Air Act unambiguously triggers a construction moratorium in States like Wyoming and Texas whenever new pollutants are regulated under the Act, because Section 165 applies directly to sources and immediately prohibits construction of sources without up-to-date permits. Section 165, as relevant, states: "No major emitting facility on which construction is commenced after August 7, 1977, may be constructed in any area to which this part applies unless," among other things, "a permit has been issued for such proposed facility in accordance with this part" and "the proposed facility is subject to the best available control technology for each pollutant subject to regulation under this chapter." 42 U.S.C. § 7475. But Section 165 applies only through the relevant SIP, not directly to sources. *See id.* § 7471 ("each applicable implementation plan shall contain emission limitations and such other measures as may be necessary, as determined under regulations promulgated under this part, to prevent significant deterioration of air quality in each region"); *EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7, 28 (D.C. Cir. 2012) (Clean Air Act "reserves the first-implementer role for the States"). It would make no sense for the Clean Air Act to set out a role for the States in implementing the PSD program in the first instance but then bypass the States when the PSD program is amended. To be sure, because of Section 165, States are *required* to change their SIPs when EPA changes the PSD requirements. But the statute does not tell us how quickly States must do so

or what happens in the interim. For some 30 years, EPA's regulation has filled that statutory gap. It is at least reasonable to read the statutory language – as EPA has done for those 30 years – to allow a facility to begin construction if a permit has been issued in accordance with the existing SIP while the State goes about revising that SIP within a time reasonably set by EPA.

The regulation, then, represents a reasonable way to fill a statutory gap and structure the transition process when EPA has adopted new PSD regulations that require changes to SIPs. Therefore, I would not accept EPA's drive-by effort to neuter the regulation here instead of going through the requisite legal process for amending or repealing it.

\* \* \*

In this case, EPA in effect has required all States – including those without automatically updating SIPs, such as Texas and Wyoming – to immediately update their PSD permitting process when PSD requirements are changed. That approach cannot be squared with EPA's regulation. Section 51.166(a)(6)(i) expressly allows the States without automatically updating SIPs three years to update the PSD programs in their SIPs when PSD requirements are changed. That regulation has been on the books and followed by EPA for some 30 years. EPA may now believe that the regulation is bad policy. If so, EPA should change the regulation. But until then, the regulation remains binding law.

In light of the regulation, I would therefore vacate the relevant EPA orders in this case.

10

II

EPA also relied on alternative grounds for imposing a Federal Implementation Plan on Texas. EPA retroactively disapproved Texas's SIP *18 years* after the SIP was promulgated, allegedly because the SIP was flawed when EPA first approved it. In my view, EPA's alternative ground for imposing a FIP on Texas is likewise flawed.

EPA disapproved Texas's SIP under the "error correction" provision of the Clean Air Act, Section 110(k)(6). Section 110(k)(6) provides: "Whenever the Administrator determines that the Administrator's action approving, disapproving, or promulgating any plan or plan revision (or part thereof) . . . was in error, the Administrator may . . . revise such action as appropriate without requiring any further submission from the State." 42 U.S.C. § 7410(k)(6). Both Texas and EPA agree that the error correction provision allows EPA to revise its action approving or disapproving a SIP only when that action "*was* in error." That is, Section 110(k)(6) can be used to retroactively disapprove a SIP only if the SIP was out of compliance with the Act or EPA regulations when the SIP was originally approved.

EPA claims that Texas's SIP was flawed when it was originally approved because the SIP neither (i) updates automatically to incorporate new federal regulations, like the greenhouse gas regulations, nor (ii) provides assurances that the State will update its plan as necessary whenever a new EPA regulation issues. *See* 76 Fed. Reg. 25,178, 25,179 (May 3, 2011); 75 Fed. Reg. 82,430, 82,431 (Dec. 30, 2010). EPA therefore issued a FIP for Texas.

The problem with EPA's analysis is that nothing in the Clean Air Act or in EPA's regulations requires that SIPs automatically update or that States provide express assurances

that they will revise their plans every time EPA issues a new regulation. To begin with, EPA admits both in its briefs and in its regulations that SIPs are not required to be automatically updating. EPA Br. 55; 76 Fed. Reg. at 25,198. So the fact that Texas's SIP does not automatically incorporate new federal regulations is a red herring. In addition, nothing in the PSD permitting regulations or in the statute requires a State to "address, or provide assurances of the requisite legal authority concerning, the application of PSD to all pollutants newly subject to regulation." 75 Fed. Reg. at 82,433. And EPA cannot disapprove a SIP based on a non-existent requirement. To be sure, the Clean Air Act requires States to provide "assurances that the State . . . will have adequate personnel, funding, and authority under State (and, as appropriate, local) law to carry out such implementation plan." 42 U.S.C. § 7410(a)(2)(E). But providing "assurances that the State" has "authority" to "carry out such implementation plan" just means that the State must be capable of administering the SIP it submits to EPA. That language does not require a State to assure EPA in advance that the State has "authority" to *revise* its plan every time a new pollutant is regulated. So Texas's 1992 SIP was not flawed when EPA originally approved it.

Because Texas's SIP was valid when approved, EPA's action in approving it back in 1992 was not "in error." So EPA was not authorized to disapprove it now under Section 110(k)(6).

* * *

In sum, EPA did not have authority to disapprove Texas's and Wyoming's SIPs or to issue FIPs to regulate emissions of greenhouse gases in those States until the expiration of the three-year period set forth in EPA's regulation. Under that binding EPA regulation, States without

automatically updating SIPs are entitled to three years to revise their SIPs to cover greenhouse gases. During that time, States have legal authority to issue valid permits under their existing SIPs. EPA's orders should therefore be vacated.

For those reasons, I respectfully dissent.